UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


ELLEN BRICKNER                          CIVIL ACTION

VERSUS                                  NUMBER: 05-1703

JO ANNE B. BARNHART,                    SECTION: "B"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


### REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Disability Insurance Benefits ("DIB"). (Rec. docs. 10, 11).

Ellen Brickner, plaintiff herein, filed the subject application for DIB on May 22, 2003, with a protective filing date of May 5, 2003, alleging disability as of June 15, 2001. (Tr. pp. 39-41, 42). In a Disability Report completed by plaintiff on May 19, 2003, she identified carpal tunnel syndrome ("CTS"), rheumatoid arthritis, narcolepsy, high blood pressure, diarrhea and gas, depression, memory problems, and plantar fascia as the conditions resulting in her inability to work. (Tr. p. 55). Those conditions first began bothering plaintiff in September of 1997 and ultimately rendered her unable to work in June of 2001. (Id.).

Plaintiff's application for DIB was denied at the first step of the Commissioner's administrative review process on August 12, 2003. (Tr. pp. 30-33). Pursuant to her request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on April 13, 2004 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified.  (Tr. pp. 34-35, 225-259).  On July 23, 2004, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. pp. 11-22).  The Appeals Council (AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner.  (Tr. pp. 3-5).  It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In her cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

A.   [t]he ALJ failed to consider whether the plaintiff's knee impairment met or equaled §1.02(A) of the Listing of Impairments and therefore, failed to follow the proper Steps in the sequential evaluation process [20 CFR §404.1520(d)].  This is a reversible error of law.

B.   [t]he ALJ's assessment of residual functional capacity (RFC) was unsupported by substantial evidence; the ALJ gave great weight to a non-examining, non-medical opinion over the formal functional capacities evaluation ordered by plaintiff's treating orthopedist.

C.   [t]he ALJ failed to properly weigh the medical opinion of the plaintiff's treating psychiatrist.  The ALJ rejected the treating psychiatrist's medical opinion without weighing it.  This is a plain violation of § 404.1527(b) and thus, constitutes a reversible error of law.

2

(Rec. doc. 10, p. 3).

Relevant to the issues to be decided by the Court are the following findings made by the ALJ:

1.  [c]laimant met the disability insured status requirements of the Act on the alleged onset date (June 15, 2001) and continues to meet at least through the date of this decision.

2.  [c]laimant has not engaged in substantial gainful activity since June 15, 2001.

3.  [t]he medical evidence establishes that claimant has severe impairments, including carpal tunnel syndrome, status-post right-sided release, arthritis in multiple joints, including chondromalacia and internal derangement in the right knee, and degenerative changes in the cervical and lumbar spines; diverticulitis; hypothyroidism; hypertension; narcolepsy; and major depressive disorder. Claimant is also overweight, but she does not have an impairment or combination of impairments that are listed in, or that equal in severity an impairment found in the Listing of Impairments at 20 CFR Part 404, Subpart P, Appendix 1.

4.  [c]laimant's severe mental impairment has led to a mild degree of restriction in her activities of daily life and a moderate degree of difficulty in her abilities to maintain (1) social functioning and (2) concentration, persistence or pace, but she has not experienced extended episodes of decompensation. Furthermore, there is no indication that the affective disorder has led to repeated, extended episodes of decompensation or resulted in such a marginal adjustment that even minimal increases in mental demands or environmental changes would cause decompensation and she has been able to function outside of a highly supportive living arrangement.

5.  [t]he subjective complaints expressed by claimant are reasonably related to her medically determinable physical impairments.

6.  [b]ased on the evidence in its entirety, claimant's testimony and other statements regarding her subjective complaints and functional limitations was generally credible, but her testimony, the objective medical evidence and reasonable inferences therefrom does not

support the conclusion that she is incapable of performing any level of sustained work.

7.   [c]laimant retains the exertional capacity for the sustained performance of a modified range of light work activities:  she can sit for up to six hours per workday; she can occasionally climb, stoop, kneel and couch; she cannot balance or climb ropes, ladders or scaffolds; she cannot perform tasks that require continuous or repetitive fine-finger manipulation.

8.   [c]laimant has these work-related mental limitations: she must work with things more than people; she must have minimal contact with members of the general public; and she is limited to routine, repetitive, simple tasks.

9.   [c]laimant is unable to perform her past relevant work as a computer graphic designer, teleprompter operator or retail camera sales.

10.  [a]s of June 15, 2001, claimant was approximately three months for (sic) her 50th birthday and she is considered to be within the closely approaching advanced age category at all relevant times.

11.  [c]laimant is a college graduate.

12.  [a]lthough her past relevant work was skilled, claimant's work-related mental limitations prevent her from using those skills in any alternate occupations:  she has no transferable skills.  However, in view of her age and base-level exertional capacity, the issue as to the transferability of work skills is immaterial.

13.  [i]f claimant's exertional capacity was for a full range of light work activity and there were no nonexertional impairments, in consideration of such a capacity and her age, education and work experience, Rules 202.21-23 of the Medical-Vocational Guidelines at 20 CFR Part 404, Subpart P, Appendix 2 would direct a conclusion that she is not disabled.

14.  [c]onsidering her residual functional capacity (including nonexertional limitations), age, education, work history and the expert vocational testimony, there are jobs in significant numbers in the national economy that claimant can perform.  The jobs and respective, approximate incidence in the national economy, as reduced by the factors specified above, include:  stock/inventory clerk,

660 in the economy of this state and 49,200 in the
national economy; general office helper, 1400 in this
state and 105,700,000 nationally; administrative support,
382 in this state and 31,500 nationally; and production
inspector, 7700 in this state and 84,700 nationally.

15. [c]laimant was not under a disability, as defined in the
Social Security Act, at any relevant time through the
date of this decision.  42 U.S.C. 416(i)(1)(A); 20 CFR
404.1520(f).

(Tr. pp. 20-21).

Judicial review of the Commissioner's decision to deny DIB is
limited under 42 U.S.C. §405(g) to two inquiries:  (1) whether
substantial evidence of record supports the Commissioner's
decision, and (2) whether the decision comports with relevant legal
standards.  Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992);
Villa v. Sullivan, 895 F.2d 1019, 1021 (5 th Cir. 1990); Fraga v.
Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's
findings are supported by substantial evidence, they are conclusive
and must be affirmed.  42 U.S.C. §405(g); Richardson v. Perales,
402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial
evidence is appropriate only if no credible evidentiary choices or
medical findings exist to support the Commissioner's decision.
Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial
evidence is more than a scintilla, less than a preponderance, and
is such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion.  Jones v. Heckler, 702 F.2d 616,
620 (5th Cir. 1983).  The Court may not reweigh the evidence or try
the issues de novo, nor may it substitute its judgment for that of

5

the Commissioner. <u>Cook v. Hecker</u>, 750 F.2d 391, 392 (5th Cir. 1985).
Conflicts in the evidence are for the Commissioner to resolve, not
the courts.  <u>Patton v. Schweiker</u>, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB bears the burden of proving that she is
disabled within the meaning of the Social Security Act.  <u>Harrell v.
Bowen</u>, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as
the "inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental impairment
which ... has lasted or can be expected to last for a continuous
period of not less than 12 months."  42 U.S.C. §423(d)(1)(A).  Once
the claimant carries her initial burden, the Commissioner then
bears the burden of establishing that the claimant is capable of
performing substantial gainful activity and is, therefore, not
disabled.  <u>Harrell</u>, 862 F.2d at 475.  In making this determination,
the Commissioner utilizes the five-step sequential analysis set
forth in 20 C.F.R. §404.1520, as follows:

1.  an individual who is working and engaged in substantial
    gainful activity will not be found disabled regardless of
    the medical findings.

2.  an individual who does not have a "severe impairment"
    will not be found to be disabled.

3.  an individual who meets or equals a listed impairment in
    Appendix 1 of the Regulations will be considered disabled
    without consideration of vocational factors.

4.  if an individual is capable of performing the work that
    she has done in the past, a finding of "not disabled"
    must be made.

5.  if an individual's impairment precludes her from
    performing her past work, other factors, including age,

6

education, past work experience, and residual functional
capacity, must be considered to determine if other work
can be performed.

On the first four steps of the analysis, the claimant bears
the initial burden of proving that she is disabled and must
ultimately demonstrate that she is unable to perform the work that
she has done in the past.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5,
107 S.Ct. 2287, 2294 n.5 (1987).  If the analysis reaches the fifth
step, the ALJ may establish that other work is available that the
claimant can perform by relying on expert vocational testimony or
other similar evidence to establish that such jobs exist.  Fraga,
810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th
Cir. 1985)).   Once the Commissioner demonstrates that the
individual can perform other work, the burden then shifts back to
the claimant to rebut that finding.  Mays v. Bowen, 837 F.2d 1362,
1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

At the time of the administrative hearing held on August 13,
2004, plaintiff was fifty-two years of age, possessed a four-year
college degree, and had past relevant work experience as a computer
graphic designer, a teleprompter operator, and a retail camera
salesperson.  Although her attorney would later argue that it was
the combination of her impairments that rendered her disabled,
plaintiff testified that she stopped working in June of 2001 due to
hand pain.  Carpal tunnel surgery that was performed in 2000 had
provided some relief but she still suffered from functional
deficits in that hand as well as mild CTS in the left hand.

Plaintiff testified that she could not carry a cup, open jars, chop, grasp, or effectively lift or hold objects. She also testified to suffering from increasingly severe pain to the right knee which was rated as a "5" on a scale of 1 to 10. Plaintiff was reportedly bedridden for one week following the initial exacerbation of her knee pain but then began receiving injections in the affected area and could soon walk and drive again. She took prescribed medication for her knee pain but still experienced problems with walking and standing after thirty to forty minutes and could sit for a similar length of time before experiencing left lower back pain.

In addition to her hand and knee difficulties, plaintiff also suffered from anxiety and depression for which she had seen Dr. Glade for seven years. Symptoms of her psychiatric difficulties included low motivation and energy levels, crying spells, a lack of punctuality, and poor social functioning and concentration such that she could no longer even read a newspaper. Plaintiff testified that her depression had worsened over the years and that she could no longer perform household chores, causing her to secretly save her money to hire a housekeeper to keep peace with her husband. For her depression, plaintiff took Lexapro and Wellbutrin XL. Even with twelve hours of sleep at night, plaintiff testified that she customarily took a two and one-half hour nap in the morning, and a one-hour nap in the early afternoon, and a one-hour hap in the late afternoon. She was capable of preparing

8

simple meals.  (Tr. pp. 229-240).

Kelly Roberts, a duly-qualified VE, was next to take the stand.  The ALJ presented a hypothetical question to Roberts which assumed an individual of plaintiff's age, education, and work experience who could lift and/or carry twenty pounds occasionally, ten pounds frequently; who could occasionally perform various postural maneuvers but could not balance; who could stand/walk/sit for six hours per eight-hour day workday with the opportunity to shift positions after one hour; who could not climb ladders, ropes, or scaffolds; who could not perform continuous, repetitive fine-fingered manipulations; who was to have minimal contact with members of the general public; and, who required work of a routine, repetitive nature.  In answer thereto, the VE testified that the described individual could function as a stock/inventory clerk, a general office clerk, an administrative support worker, or a production inspector, with significant numbers of such jobs being available in the local and national economies.  In answer to the ALJ's further inquiries, the VE testified that the described individual would not be employable if she had workplace absences in excess of two per month, if she required more than the customary lunch and break periods, or if she could not consistently maintain attention, concentration, and pace.  (Tr. pp. 240-249).

Upon being tendered to plaintiff's attorney for further questioning, to the hypothetical question as originally framed by the ALJ, counsel added various moderate limitations of function

that an Administration psychologist had imposed on August 5, 2003 after reviewing some of plaintiff's medical records.  In answer to that amended hypothetical, the VE testified that the available jobs that she had previously identified could still be performed as they were sufficiently simple and could be done away from the general public.  Counsel further noted that the Administration psychologist had never treated or examined plaintiff, that his assessment was based entirely on the results of a consultative examination which were at odds with that examiner's findings of moderate to severe impairment of functions, and that the psychologist had not even considered the seven-year treatment records of plaintiff's treating psychiatrist, Dr. Glade.  Plaintiff's counsel then directed the VE to the findings set forth in a "Psychiatric Evaluation Form" completed by Dr. Glade on March 11, 2004 in which the she concluded that plaintiff was markedly impaired in her ability to appropriately respond to supervision and to co-workers and was moderately impaired in her ability to deal with workplace changes and to complete a normal workday or week without significant interruption due to psychologically-based symptoms.  If credited, the VE testified that those limitations would make it very difficult for plaintiff to maintain employment.  In closing, counsel argued that Dr. Glade's opinions should be given controlling weight under 20 C.F.R. §404.1527 (d)(2) and lead to a finding that plaintiff was disabled. Alternatively, counsel argued that the criteria of Listing 1.02(A) had been met, also justifying

10

a finding that plaintiff was disabled.  (Tr. pp. 249-259).

The medical records admitted in the administrative proceedings below which were generated in the year preceding the alleged onset date of June 15, 2001 begin with a treatment note from Dr. Susan Glade dated September 11, 2000.  Plaintiff's depression was characterized as stable but she complained of increased irritable bowel syndrome ("IBS") caused by stress in her family.  Plaintiff was continued on Wellbutrin and Buspar.  (Tr. p. 217).  She returned to Dr. Glade on April 12, 2001 and reported that she had been doing well until two weeks earlier when she had an episode of CTS and tendinitis but continued working until she was unable. Plaintiff complained of guilt and increased IBS.  Her medications were adjusted and she was directed to return to the clinic in three months.  (Id.).

On May 1, 2001, plaintiff was evaluated by Dr. Harold Stokes of Hand Surgical Associates, Ltd. for the purpose of obtaining a second opinion regarding symptoms in her left hand and recurrent symptoms in her right.  Plaintiff had undergone a right carpal tunnel decompression at the hands of Dr. Rauchwerk in April of which had relieved her symptoms until five weeks earlier when she began experiencing severe pain in that extremity even when holding a pencil.  In the previous year, plaintiff had also begun experiencing numbness and tingling in the left hand for which Dr. Rauchwerk had also suggested surgery.  On physical examination, plaintiff had a full range of motion in both wrists and hands with

11

no neurologic deficits but the Phalen's test was promptly positive on the left.  On palpation of the right wrist, Dr. Stokes was unable to find any specific joint tenderness notwithstanding plaintiff's complaints of pain with any activity.  X-rays revealed no bony abnormalities in either hand.  Dr. Stokes' impression was CTS of the left hand for which nerve conduction studies were recommended.  He questioned whether there was a correlation between plaintiff's computer work and her symptoms, stating that he felt that to be the case on the left side but expressing some doubt about plaintiff's right hand and wrist as there was no obvious etiology for the pain she claimed to be experiencing.  (Tr. pp. 100-101).

Plaintiff underwent the recommended EMG/nerve conduction studies of only the left hand on May 8, 2001 which revealed mild CTS.  (Tr. pp. 98-99).  On May 12, 2001, Dr. Stokes reported that plaintiff had "considerably improved" since starting on Medrol Dosepak with no hypersensitivity and excellent motion with normal sensation.  Plaintiff remained apprehensive about undergoing surgery on her left hand given the possibility of recurrence and the need for further surgery on the right.  (Tr. p. 97).  Plaintiff returned to Dr. Stokes on May 14, 2001 to obtain the results of the recent diagnostic testing.  She was wearing a splint and despite having received three steroid injections, she still had symptoms in her left hand.  Dr. Stokes recommended to plaintiff's workers' compensation carrier that decompression surgery be performed on the

left.  Pending such surgery, plaintiff was restricted to four hours of keyboard work per day, one hour off and one hour on.  (Tr. p. 96).

Plaintiff underwent EMG/nerve conduction studies of the right hand on May 22, 2001 which revealed moderate CTS on that side. (Tr. pp. 94-95).  On June 4, 2001, Dr. Stokes reported that scheduled surgery to plaintiff's left hand had been cancelled as she had decided to focus her rehabilitation efforts on her right hand which was far more symptomatic.  Plaintiff was started on steroids and was kept on limited duty with no keyboard or mouse work.  (Tr. p. 93).  On July 11, 2001, plaintiff advised Dr. Stokes that after doing no typing for five weeks, she had used her keyboard at home and had experienced pain in the right hand after thirty minutes as well as paresthesias in the left hand.  Plaintiff was reluctant to consider surgery at that time and stated that she intended to seek other work.  (Tr. p. 91).

Plaintiff returned to Dr. Glade on August 6, 2001 and reported that she had applied for workers' compensation and Social Security benefits due to her CTS.  Plaintiff complained of a recurrence of her depression secondary to the loss of her job and chiding by co-workers, causing her to stay in bed for the previous two weeks. Her medications were adjusted.  (Tr. p. 217).  Plaintiff was next seen at Orleans Orthopaedic Associates on November 26, 2001 for complaints of intermittent neck pain running into the arm and right hip pain.  On physical examination, plaintiff had a good range of

motion in the cervical spine with some spasm and decreased reflexes. Hips had a full range of motion. X-rays of the cervical spine revealed spondylosis primarily at 5-6 and similar studies of the hip were negative. The diagnosis was osteoarthritis, status post carpal tunnel release, and cervical spondylosis. Plaintiff was placed on another course of non-steroidals and physical therapy and was to return to the clinic in one month. (Tr. p. 108). Plaintiff was seen at New Orleans Eye Specialists on October 17, 2001 for complaints of occasional dryness of the eyes. (Tr. p. 198).

On November 30, 2001, Dr. Stokes corresponded with plaintiff's compensation carrier to provide further information on her condition. He opined that surgical intervention was not appropriate at that time and that she was capable of sedentary to light-level work but with no keyboard usage. In Dr. Stokes' opinion, plaintiff had reached maximum medical improvement as of July 11, 2001 unless she opted for further surgery. (Tr. pp. 89-90). Plaintiff returned to Dr. Glade on December 13, 2001 and reported depression and grief over the death of her father-in-law. Her medications were adjusted that day and again telephonically the following day. (Trp. p. 216).

Plaintiff was next seen by Dr. Manale of Orleans Orthopaedic Associates on February 26, 2002. She complained of intermittent neck, hip, and arm pain. Plaintiff had also suffered from left knee pain for the previous two to three weeks which she attributed

14

to taking Jazzercise classes but which was improving.  A cervical exam revealed mild muscle tenderness, mild to moderate muscle spasm, decreased range of motion by 50% on forward flexion, extension, and lateral rotation with moderate pain on axial compression.  Grip strength was fair.  The assessment was osteoarthritis, carpal tunnel release, cervical spondylosis, and rheumatoid arthritis.  Plaintiff's medications were renewed and she was referred to a rheumatologist.  (Trp. pp. 107-108).  Additional eye care was administered by New Orleans Eye Specialists on April 18, 2002.  (Tr. p. 198).

On May 7, 2002, plaintiff returned to Orthopaedic Associates when she was seen by Dr. Kenneth Adatto.  Plaintiff continued to have pain in her foot, especially on the left side, and CTS symptoms in her right hand, including weakness with activities and episodes of pain radiating from the hand and wrist up the elbow. She had been seeing a vocational rehabilitation counselor to try to transition into different work.  On physical examination, plaintiff had 75% range of motion with mild tenderness and spasm in the cervical trapezius muscles and non-tender paraspinals.  Strength was equal and intact in both grip and upper extremity strength with no sensory loss.  The assessment was plantar fasciitis, CTS, cervical spondylosis, and rheumatoid arthritis.  Plaintiff was given refills for her medications and a prescription for new shoe inserts.  (Trp. pp. 106-107).

When plaintiff returned to Dr. Glade on May 8, 2002, she was

characterized as suffering from severe depression with crying spells due to marital strife. Medications were prescribed. (Tr. p. 216). Plaintiff's crying spells had slightly improved by May 21, 2002 although she was still struggling to cope with her husband's sometimes obsessive behavior. Her medications were continued. (Tr. p. 215). Plaintiff was next seen by Dr. B. Angelico of Jefferson Medical Associates on June 6, 2002 for complaints of sinus congestion and fever of two day's duration as well as palpitations. The diagnosis included an upper respiratory infection and fatigue. Plaintiff was given an injection of Celestone and was prescribed Claritin. (Tr. p. 111).

At the direction of Dr. Angelico, plaintiff underwent an ECG on June 11, 2002 which produced normal results. A cardiac doppler study performed on the same day revealed only minimal findings. (Tr. pp. 134-135). Plaintiff then underwent a treadmill ECG test on June 25, 2002 which yielded inconclusive results because plaintiff did not achieve the target heart rate secondary to fatigue but with no chest pain. (Tr. pp. 131-133). Plaintiff was seen by Dr. H.B. McCarthy on July 23, 2002 for complaints of severe diarrhea. The impression was a history of diverticulitis with resection. (Tr. pp 144-146).

Plaintiff was seen again at Orthopaedic Associates on August 20, 2002. She still had some problems with plantar fasciitis but her CTS was "under relative control." A cervical spine exam showed loss of motion with spasm upon stress. Plaintiff was characterized

16

as a "chronic pain patient" and was counseled on alternatives to narcotic medication. She was apparently given refills on unspecified medication(s) but was strongly cautioned on their proper use. The diagnosis was CTS, cervical sponlylosis, rheumatoid arthritis, and plantar fibromatosis. Plaintiff's disability status was rated as "regular work." (Tr. pp. 105-106).

On October 29, 2002, plaintiff returned to Dr. Glade for further treatment. She was essentially functioning well but still suffered from episodes of crying spells, during some of which she just wanted to stay in bed. The impression was partially returned depression. Wellbutrin, Buspar, Proviquil, and Lexapro were prescribed. (Tr. p. 215). Plaintiff was followed at the Cardiology Associates of Jefferson on November 11, 2002 and her hypertension was said to be well-controlled at this time. She was continued on her present medications and was directed to return to the clinic in six months. (Tr. p. 129). Plaintiff reported weakness and pain upon opening jars and bottles when seen again by Dr. Adatto on December 9, 2002. Her feet were still bothersome and her neck was worse but her hips were doing better and exercise seemed to help. In the cervical spine, plaintiff had 50% or less range of motion with moderate tenderness and spasm in the cervical paraspinals as well as the trapezius muscle groups. There was pain into the neck and shoulder with shoulder abduction but plaintiff did have a full range of shoulder motion, albeit with pain. Strength was equal and intact in both grip and upper extremity

17

strength with no sensory loss.   Tinel's sign was positive bilaterally.   The assessment was CTS, rheumatoid arthritis, and cervical spondylosis.   Plaintiff was given samples of Arthrotec and her prescription for Vicodin was renewed but Naprosyn was discontinued due to gastrointestinal discomfort.   (Tr. pp. 104-105).

Plaintiff was declared to be fairly stable when she was next seen by Dr. Glade on December 10, 2002.   She no longer had crying spells after having discontinued the use of Lexapro several days earlier.   Plaintiff was to continue taking Buspar, Wellbutrin, and Proviquil and was to be seen again in three months.   (Tr. p. 214).   She telephoned Dr. Glade's office the following day and reported seeing spots.   She was instructed to see her cardiologist.   (Tr. p. 214).   Plaintiff then contacted Dr. Malik's office to complain of her blurry vision.   The dosage of her Lopressor was decreased and she was advised to monitor her blood pressure and to call the office as needed.   (Tr. p. 128).   Plaintiff presented herself to Cardiology Associates of Jefferson on December 13, 2002 and complained of experiencing hot flashes when she initially cut back on her Lopressor but was feeling better at the time.   (Tr. p. 127).   The cardiologist's findings were reported to Dr. Glade's office. (Tr. p. 213).   Plaintiff was still depressed and was suffering from crying spells when she was next seen by Dr. Glade on January 3, 2003.   Her medications were adjusted and she was to return to the doctor in six weeks.   (Tr. p. 213).

On February 4, 2003, plaintiff returned to New Orleans Eye Specialists to have her eyes checked.  (Trp. p. 197).  She reported a decrease in her crying spells and her depression when she was seen again by Dr. Glade on February 17, 2003.  The plan was to wean her off of some of her depression-related drugs and for her to return to the clinic in three months.  (Tr. p. 213).  Plaintiff's eyes were "much better" and less dry when she was re-evaluated at New Orleans Eye Specialists on April 2, 2003.  (Tr. p. 196).

The following day, plaintiff was seen again by Dr. Adatto of Orleans Orthopaedic Associates.  Complaints at that time were neck, back, and right wrist pain.  More specifically, plaintiff reported intermittent neck symptoms, moderate neck pain, aching, stiffness, and soreness; intermittent, moderate lower back pain; and, right wrist/hand pain with numbness, tingling, and aching.  Plaintiff had normal activity and energy levels.  On physical examination, there was a loss of lordotic curve in the cervical spine with absence of tilt and scoliosis.  There was moderate spasm of the paraspinous muscles and moderate tenderness of the spine and moderate limitation of motion.  Plaintiff had a full range of motion in the shoulders and  symmetrical muscular development and strength in both upper extremities.  As for the lumbar spine, there was mild tenderness of the paraspinous muscles and spinous process with a mild loss of motion in forward flexion and extension and spasms were present.  Straight leg raising tests produced only low back discomfort in the sitting and recumbent positions.  There was a

mild Tinel's sign and loss of extension in the right wrist and plaintiff experienced increasing neuritis with repetitive use. The diagnosis was cervical and lumbar spondylosis without myelopathy and compression neuropathy in the form of CTS. In his treatment plan and recommendation, Dr. Adatto remarked that plaintiff suffered from chronic pain that was unchanging. Although her condition was stable, the prognosis for a full recovery was poor. Surgery was not recommended at the time nor was invasive testing or diagnostic workup. The treatment plan included a home exercise program, medication for symptom complaints, and periodic monitoring of her condition. Plaintiff was instructed on the use of Lidoderm patches and was given a sample of same. Her disability status was "regular work." (Tr. pp. 102-103).

Plaintiff had decreased crying spells when she returned to Dr. Glade on April 17, 2003 but her energy level was low and she was sleeping a lot. She had also recently gained weight after discontinuing thyroid medication. Plaintiff's medications were adjusted and she was to return in four to six weeks. (Tr. p. 212). She had no chest pain or shortness of breath and was said to be doing well when next seen at Cardiology Associates on May 12, 2003. (Tr. p. 123). Plaintiff saw Dr. Angelico three days later and the results of her physical examination were unremarkable. (Tr. p. 110).

At the suggestion of Dr. Angelico, plaintiff underwent an adenosine stress test and cardiac nuclear testing on May 19 and 20,

2003.  The results of the stress test were normal but the nuclear testing revealed a small non-reversible defect involving the anterior segment of the LV most likely secondary to breast attentuation.  (Tr. pp. 112-122).  Plaintiff complained of "crust" in her eyes when seen at New Orleans Eye Specialists on May 27, 2003.  (Tr. p. 195).  Two days later, Dr. Glade prepared a brief typewritten narrative for the Administration in which she reported that plaintiff was being treated for anxiety and depression with symptoms of lethargy, hypersomnia, weight gain, worry, and subjective depression which had been "fairly well controlled with medication..."  At times, plaintiff's mental difficulties did affect her concentration and memory to an unspecified degree and her prognosis was guarded.  (Tr. p. 143).

On July 17, 2003, plaintiff underwent a consultative psychiatric evaluation by Dr. Gayle Stewart, driving herself to the appointment.  Plaintiff advised Dr. Stewart that she had been depressed since her son had been expelled from three high schools. She described ongoing conflict between herself, her husband, and her son, resulting in therapy to deal with her depression, lethargy, fatigue, crying spells, hopelessness, suicidal thoughts, and IBS when she became anxious.  Concentration was difficult and plaintiff stated that she had been diagnosed with narcolepsy. Plaintiff's daily activities were characterized as "typical" – helping her husband prepare for work, doing housework, running errands, and attending Jazzercise – but she was reportedly in and

out of bed all day which she believed was a side effect from Lopressor and not just the result of narcolepsy or depression. On examination, plaintiff's thought processes were goal-oriented and logical with no hallucinations, delusions, or suicidal or homicidal ideations. Plaintiff's memory was good and her fund of knowledge was fair and commensurate with her educational level. The diagnostic impression was major depressive disorder and anxiety disorder, not otherwise specified, with an Axis IV rating of moderate to severe and a GAF of approximately 45. In the "Degree of Impairment" portion of her report, Dr. Reynolds opined that plaintiff was capable of handling her own financial affairs but that a change in her medications was appropriate. (Tr. pp. 147-150).

Plaintiff returned to Dr. Adatto for follow-up care on July 24, 2003. She continued to complain of neck and back pain but there had been no major change to her symptoms. Plaintiff was said to be functioning at normal activity and energy levels and did not demonstrate anxiety or depression. In the cervical spine, plaintiff had mild spasm only at stress but with limited motion. Motor, power, and sensation were active in both upper extremities. In the lumbar spine, plaintiff had limited motion with mild spasm present at stress only. Plaintiff was able to heel-to-toe walk unaided. A normal, full range of motion was present in both wrists. The diagnosis was cervical and lumbosacral spondylosis without myelopathy and CTS. Plaintiff's condition was stable but

the prognosis for a full recovery was poor.  Surgical intervention was discussed but not recommended.  The "Disability Status" was again "Regular Work."  (Tr. pp. 191-192).

On August 5, 2003, an Administration psychologist completed two standardized forms bearing on plaintiff's mental ability to engage in work-related activities after apparently reviewing only the results of the consultative evaluation performed by Dr. Stewart on July 17, 2003.  In the "Psychiatric Review Technique" form, the psychological consultant found that plaintiff suffered from affective disorders in the form of major depressive disorder and anxiety disorder, not otherwise specified, but that the diagnostic criteria of Listing 12.04 had not been met because plaintiff was not functionally limited to the required degree.  (Tr. pp. 155-168).  In the second form, titled "Mental Residual Functional Capacity Assessment," the psychologist found that plaintiff suffered from moderate limitations in only six of the twenty categories of work-related functions.  (Tr. pp. 151-154).  An Administration reviewer whose title was "Analyst II" also completed a "Physical Residual Functional Capacity Assessment" form on August 7, 2003.  Identifying the primary diagnosis as hypertension, the reviewer found that plaintiff retained the ability to lift twenty pounds occasionally and ten pounds frequently; to sit, stand, and/or walk for six hours per eight-hour workday; to occasionally be able to climb, stoop, and crouch; to be limited with fine manipulation due to CTS; and, to have no visual, communicative, or

environmental limitations. (Tr. pp. 169-176).

Plaintiff returned to Dr. Glade on August 19, 2003 who adjusted her medications in an attempt to minimize the number of drugs she was taking. (Tr. p. 211). On September 26, 2003, plaintiff underwent a colonoscopy which produced results indicative of diverticulosis. (Tr. pp. 201-203). She returned to Orleans Orthopaedic Associates on November 18, 2003 where she was evaluated by Dr. John Watermeier. Plaintiff complained of mild neck and back pain, weakness, tingling, and numbness in both wrists. There was a positive Tensel's sign in both wrists reproducing paresthesias and tingling into the hands and fingers. The diagnosis was CTS. Dr. Watermeier believed that plaintiff's prognosis was fair. He rated her work status as light and advised her to avoid "heavy" lifting of over ten to twenty pounds and repetitive motion or prolonged use of the hands including grasping, pinching, and fine manipulation. (Tr. p. 190). Plaintiff's eyes were checked at New Orleans Eye Specialists on November 21, 2003. (Tr. p. 194).

When plaintiff was seen again by Dr. Glade on November 25, 2003, her condition was described as stable except for some side effects from her prescribed medications. Plaintiff reported gaining twenty-seven pounds in the previous six months. Her medications were adjusted further and additional testing was suggested. (Tr. p. 210). Plaintiff was next seen by Dr. McCarthy on December 2, 2003 for complaints of pain in her left lower abdomen and diarrhea. Lomitil was prescribed. (Tr. pp. 199-200).

Plaintiff's eyes were very dry and red when she returned to New Orleans Eye Specialists on December 5, 2003 and she asked to be given glasses. (Tr. p. 194). Laser surgery was performed on December 15, 2003. (Tr. p. 193). Plaintiff's prescription for Synthroid was renewed on January 16, 2004. (Tr. p. 204).

On January 20, 2004, plaintiff received follow-up care in connection with her recent laser surgery. (Tr. p. 193). She was also seen by Dr. Watermeier that same day after twisting her right knee during Jazzercise class with resulting aching and swelling. The treatment note indicates that plaintiff had normal activity and energy levels and that she was being seen for ". . . follow up after knee surgery" although there are no records documenting that such a procedure took place. X-rays revealed symmetrical joint space narrowing, medial marginal osteophytes present, and joint arthritis. The diagnosis was internal derangement of the knee. Plaintiff was given a brace and an injection of Bupivacaine in the knee and an MRI was recommended. On this occasion, plaintiff's work status was noted as "Not Applicable" and she was advised to avoid repetitive or prolonged standing, walking, squatting, crawling, climbing, kneeling, or walking on uneven surfaces. (Tr. p. 189). Plaintiff underwent the recommended MRI on January 22, 2004 which revealed mild inflammatory change, mild lateral patellar tilt and chondromalacia, a small medial popliteal cyst and inflammation of the bursa, and a small pericruciate cyst or ganglion adjacent to the distal posterior cruciate ligament. (Tr.

p. 188).

On January 28, 2004, plaintiff returned to Dr. Watermeier to obtain the results of the recently-performed MRI.  The doctor described those results as "[c]ompletely normal.  Mild arthritis chondromalacia, posterior cyst."  Plaintiff walked with a stiff, painful gait and had moderate tenderness to palpation of the joint lines and mild crepitation but no evidence of muscle atrophy.  The diagnosis was again internal derangement of the knee.  Plaintiff was given an injection of Depo-Medrol in the knee and was declared to be "temporarily disabled."  (Tr. p. 187).  When plaintiff was next seen by Dr. Glade on January 30, 2004, she complained of increased depression with crying spells, fatigue, and excessive sleeping.  Plaintiff's medications were adjusted further.  (Tr. p. 210).

Plaintiff was seen again by Dr. Watermeier on February 17, 2004 and she indicated that her right knee pain had improved to the level of moderate but with popping and clicking.  On physical examination, plaintiff had moderate tenderness to palpation of the joint lines of the right knee and mild crepitation with no evidence of atrophy.  Once again, the diagnosis was internal derangement of the knee.  This time, plaintiff's work status was "Light Work (Based on  DOT/DOC)."  (Tr. p. 186).  On February 25, 2004,plaintiff was seen again by Dr. Watermeier who declared that plaintiff's ". . . symptoms ha[d] improved since the last office evaluation."  Plaintiff walked with a painful gait and listed to

the left.  Examination of the knee demonstrated moderate tenderness of the medial/lateral joint line, mild joint swelling, and mild crepitus within the patellofemoral joint.  There was a mild loss of motion in flexion and extension but no ligament instability or muscle atrophy.  The diagnosis was rheumatoid arthritis and primary localized osteoarthritis of the lower leg.  Plaintiff was given an injection of Synvisc in the right knee.   In terms of a work/impairment status, plaintiff was rated as suffering from permanent impairments in the following respect:   10-15% of the cervical spine, 5-10% of the knee, and 5-10% of the wrist/hands. (Tr. p. 185).

On March 10, 2004, an "Estimated Functional Capacity Form" was completed by Dr. Watermeier's office.   In that form, it was estimated that plaintiff could frequently lift up to ten pounds and occasionally lift eleven to twenty-four pounds; that she could sit, stand, and/or walk for eight hours per eight-hour workday with an option to alternate positions every forty-five minutes, give or take fifteen minutes; and, that plaintiff was unable to use her right or left hands for grasping or fine manipulation.   The doctor's office rated plaintiff as having a 10-15% total permanent anatomical disability of the cervical and lumbar spines and a 5-10% disability of the right knee and hand.   (Tr. pp. 183-184).

The following day, Dr. Glade completed a "Psychiatric Evaluation Form" that had been presented to her by plaintiff's attorney.   There, Dr. Glade identified plaintiff's diagnosis as

anxiety disorder, episodes of major depression, subjective anxiety, hypersomnia, crying spells, and weight gain.  In Dr. Glade's opinion, plaintiff's conditions rendered her moderately impaired in social functioning, in the ability to complete a normal workday or week without significant interruption, and in dealing with changes in a routine work setting.  Plaintiff was also markedly impaired in her ability to respond appropriately to supervision, to co-workers, and to usual work settings.  In answer to the question of what documentation supported her conclusions, Dr. Glade wrote "[f]luctuating moods with anxiety and depression render her undependable poor adaptive skills, impaired concentration."  Dr. Glade additionally indicated that plaintiff was moderately impaired in the concentration, persistence, and pace needed to complete tasks due to depression and anxiety impairing her cognitive capacity.  Plaintiff had reportedly suffered from repeated episodes of decompensation or deterioration in a work-like  setting due to her tendency to isolate herself and to feel ostracized and criticized.   Her medications at the time were Lexapro and Wellbutrin with no reported side effects and plaintiff's somatic complaint was diarrhea (IBS) but she still had an excellent competency to handle her own finances.  Despite being on prescribed medication, plaintiff continued to suffer from subjective depression, lethargy, anhedonia, worry, crying spells, and depression.  The prognosis was guarded.  (Tr. pp. 206-209).

The final piece of documentary evidence in the record below is

28

a printout from Orleans Orthopaedic Associates dated March 22, 2004 which indicates that plaintiff had been prescribed Vicodin ES and Lidoderm patches on February 4, 2004.  (Tr. p. 182).

As noted earlier, plaintiff challenges the Commissioner's decision to deny Social Security benefits on three grounds.  First, plaintiff alleges that the ALJ failed to consider whether her knee impairment met or equaled the criteria set forth in §1.02(A) of the Listing of Impairments.

In his written opinion of July 23, 2004, the ALJ found that plaintiff suffered from the following severe impairments: bilateral CTS, status-post right-sided release; arthritis in multiple joints, including chondromalacia and internal derangement in the right knee, and degenerative changes in the cervical and lumbar spines; diverticulitis; hypothyroidism; narcolepsy; and major depressive disorder.  (Tr. p. 20).  The ALJ then went on to find that plaintiff did ". . . not have an impairment or combination of impairments that are listed in, or that equal in severity an impairment found in the Listing of Impairments of 20 CFR Part 404, Subpart P, Appendix I."  (Id.).  Although the ALJ did not specifically cite §1.02(A) in his written decision, the Court believes, for the reasons that follow, that he properly evaluated the evidence pertaining to plaintiff's right knee and correctly found that it was insufficient to establish disability.

Initially, the Court notes that plaintiff never specifically identified a right knee impairment as a condition resulting in her

inability to work in the Disability Report that she completed on May 19, 2003.[1]/ See Pierre v. Sullivan, 884 F.2d 799, 802 (5th Cir. 1989). The closest that plaintiff came to doing so was by identifying "rheumatoid arthritis," a condition that her treating orthopedists have used at various times in diagnosing her left knee, feet, neck, hips and back. The reason that a right knee impairment was not identified in plaintiff's disability Report of May 19, 2003 is because she did not injure that extremity until January of 2004 when she twisted it during Jazzercise classes. Following that injury, plaintiff was initially seen by Dr. Watermeier on January 20, 2004 and x-rays revealed symmetrical joint space narrowing, marginal osteophytes, and arthritis. However, the diagnosis was internal derangement of the knee, not rheumatoid arthritis, and plaintiff was advised ". . . to avoid repetitive or prolonged . . . walking on uneven surfaces." (Tr. p. 189). Treatment included a steroid injection in the knee, a brace, and a home exercise program. (Id.). An MRI performed at the direction of Dr. Watermeier was interpreted by him to be "[c]ompletely normal. Mild arthritis chondromalacia, posterior cyst." (Tr. p. 187). The diagnosis on January 28, 2004 was again internal derangement of the knee and plaintiff was said to be "temporarily disabled" as of that date. (Id.). Another injection

---

[1]/ Reports such as these may properly be considered by the ALJ in determining plaintiff's disability status. Vaughan v. Shalala, 58 F.3d 129, 131 (5th Cir. 1995); Villa, 895 F.2d at 1022-23.

to the knee was administered.  (Id.).

By February 17, 2004, plaintiff's knee pain had improved to the level of moderate.  (Tr. p. 186).  Although she had moderate tenderness to palpation of the joint lines, the ligaments were stable and there was no evidence of atrophy.  The diagnosis was again internal derangement of the knee and Dr. Watermeier cleared plaintiff to return to "Light Work (Based on DOT/DOL)."  (Id.). Plaintiff's right knee symptoms had improved even further by February 25, 2004 and she was given another injection in the knee and was assessed as having a 5-10% permanent disability of that joint.  (Tr. p. 185).  Dr. Watermeier reiterated that rating on March 10, 2004 while opining that plaintiff could sit, stand, and/or walk  for eight hours per eight-hour workday provided that she could alternate positions approximately every forty-five minutes.  (Tr. pp. 184-184).  At the administrative hearing that was held approximately one month later, plaintiff testified that she had stopped working in June of 2001 due to hand pain, not as the result of any condition affecting her right knee.  (Tr. p. 229).

To satisfy the criteria of §1.02(A) relative to "[m]ajor dysfunction of a joint[ ] . . .," a claimant must have a:

. . . gross anatomical deformity (e.g. subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affect joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).

With:

    A.   Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in [an] inability to ambulate effectively, as defined in 1.00B2b; . . .

The Regulations further define an inability to ambulate effectively, as follows:

    (1)  *Definition*.  Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally has having insufficient lower extremity functions (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

    (2)  *To ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such a shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

    20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.00(b)(2)(6).

The evidence pertaining to plaintiff's right knee falls short of establishing that level of ineffective ambulation contemplated by §1.02(A). Plaintiff was cleared to perform light-level work by her own physician within two months of her Jazzercise injury of

January of 2004.  Although x-rays taken on January 20, 2004 showed joint space narrowing of the knee, plaintiff's ligaments were stable throughout this time period and she suffered from no muscle atrophy.  An MRI performed at the direction of Dr. Watermeier was interpreted by him to be "completely normal."  By February 17, 2004, plaintiff's knee pain had improved to moderate and she was declared to be capable of light work.  Plaintiff's symptoms had improved even further by February 25, 2004 and on March 10, 2004, Dr. Watermeier indicated that plaintiff could sit, stand, and/or walk for eight hours per eight-hour workday with an allowance to alternate positions every forty-five minutes.  At no time has plaintiff required an assistive device to ambulate.

In order to establish listing-level severity, a claimant must manifest and prove that she suffers from all of the specified criteria of a particular listing.  See Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 891 (1990).  While plaintiff may have had pain, stiffness, and some limitation of motion in the right knee, she did not have a gross anatomical deformity of the joint as §1.02(A) requires.  Plaintiff also did not suffer from an extreme limitation in the ability to walk, one that interfered very seriously with her ability to independently initiate, sustain, or complete activities.  Nor did she suffer from an insufficiency of lower extremity functioning so as to preclude independent ambulation without the use of hand-held assistive devices which, in turn, would limit the functioning of both upper extremities.  See

33

§1.00(B)(1).   Considering the requirements of the listing as a whole, the ALJ properly found that plaintiff's condition did not satisfy the criteria of §1.02(A).[2]/

In her second challenge to the Commissioner's decision, plaintiff argues that the ALJ's assessment of her residual functional capacity ("RFC") was unsupported by substantial evidence because ". . . the ALJ gave great weight to a non-examining, non-medical opinion over the formal functional capacities evaluation ordered by the plaintiff's treating orthopedist." (Rec. doc. 10, p. 3).   Once again, a fair reading of the ALJ's decision does not bear out plaintiff's assertion.

The ALJ began his written decision by recalling plaintiff's stated bases for disability.   (Tr. p. 14).   He then launched into a methodical recitation of all the documentary evidence admitted in the administrative proceedings below in addition to plaintiff's hearing testimony.   (Tr. pp. 14-16).   Included in the numerous pieces of evidence that the ALJ discussed was the Residual Functional Capacity Assessment form completed by the Administration reviewer on August 7, 2003 which the ALJ commented upon as follows:

> [t]he DDS analyst reviewing this claim acknowledged the severity of the underlying impairments and suggested that claimant could perform only light base-level work activities (exhibit 10F).   I find that these non-binding proposals are supported by the credible evidence and, although not required to do so, I generally endorse the

---

[2]/ See, e.g., Smith v. Barnhart, 2005 WL 1785273 at *8 (W.D. Wisc. 2005)(use of assistive device, in and of itself, is not conclusive proof of inability to ambulate).

<u>limitations</u> <u>established</u> <u>below</u>.

(Tr. p. 16)(emphasis added).

Following these comments, the ALJ returned to summarizing the evidence of record, including plaintiff's hearing testimony, the Supplemental Interview Outline completed on June 3, 2003, and plaintiff's treatment notes, first arriving at a mental RFC and then determining plaintiff's physical RFC which the ALJ referred to as a "consensus assessment" in that the latter had been assessed by Drs. Stokes and Watermeier, plaintiff's own treating physicians. (Tr. pp. 16-18). Ultimately, the ALJ determined that plaintiff was capable of performing a reduced range of light-level work activity based not only on the exertional imitations imposed by Drs. Stokes and Watermeier, but also on the non-exertional limitations resulting from plaintiff's depression. It was those very limitations which the ALJ incorporated in his hypothetical question to the VE and to which the VE responded that there were jobs available in the economy that plaintiff could still perform. (Tr. pp. 19-20).

Under the governing Social Security regulations, the ALJ was duty-bound to consider the opinions of the Administration reviewer. 20 C.F.R. §404.1527(f)(2)(i). However, contrary to plaintiff's present assertions, the ALJ did not adopt those opinions to the exclusion of those of plaintiff's treating physicians which were actually consistent with the reviewer's own findings. This claim is without merit.

In her third and final challenge to the ALJ's decision, plaintiff argues that "[t]he ALJ rejected the treating psychiatrist's medical opinion without weighing it ... [in] ... plain violation of §404.1527(b)..." (Rec. doc. 10, p. 3). The medical "opinion" in question is the Psychiatric Evaluation Form that was presented to Dr. Glade by plaintiff's counsel and was completed on March 11, 2004. (Tr. pp. 206-209). To better facilitate a resolution of plaintiff's claim, the Court will recall pertinent portions of the ALJ's written opinion bearing upon his evaluation of the evidence before him, which included the findings and opinions of Dr. Glade, as follows:

> Ms. Brickner testified that she quit working in June 2001 because, despite trying multiple ways to improve her ability to use the computer, including ergonomic equipment and speaking programs (see exhibit 1e), she was unable to continue her job as a graphic operator. Claimant admitted that the release was somewhat helpful, but she added that she had difficulty grasping and carrying objects and she previously reported that she has difficulty with tasks requiring dexterity, such as putting on jewelry, using a knife to chop while preparing food, typing and holding heavy items (exhibit 2e). At the hearing, claimant stated that she has neck, low back and multiple joint pains, now including the right knee: on January 20, 2004 she informed Dr. Watermeier that she twisted the knee at her Jazzercise class and the January 22, 2004 MRI revealed mild inflammation, with chondromalacia and cysts (exhibit 13f) and she gets Synvisc injections for swelling in that knee. She testified that she cannot sit, stand or walk for more than thirty-forty minutes and she naps several times for about five hours during the day, which she attributes to the several impairments, including depression and she added that she does not do household chores.
>
> While she testified that she does not do household chores, claimant she (sic) previously reported that, allowing for three naps, she spent her time running

errands, performing such household chores as cooking, laundry and making the beds, although she paces herself and take rests breaks during the day, and she shops, so long as her husband helps carry the heavier items (exhibit 2e). Thus, claimant has inconsistently reported her daily activities and self-assessed functional limitations. Furthermore, claimant informed Dr. Gayle K. Stewart at the July 18, 2003 consultative psychiatric exam that she does housework, runs errands, washes clothes and attends Jazzercise (exhibit 7f), a routine fairly consistent with the previous report (exhibit 2e) and her pre-hearing admission that her condition and daily activities are stable (exhibit 5e). Additionally, Dr. Susan Glade, claimant's treating psychiatrist, stated that she has no limitations in her activities of daily life (exhibit 14f).

      *   *   *   *   *   *   *   *   *   *   *   *   *
Ms. Brickner testified that she suffers from depression and she has such symptoms as chronic fatigue and anergia, with hypersomnia, easy irritability, a lack of sociability and problems with her memory and concentration. Despite the depression, claimant previously reported that she gets along with others, reads the newspaper, engages in her hobby, photography, once or twice a month, visits friends and goes to her club at least monthly, and she drives without assistance. Thus, once again, claimant's testimony is contradicted by her previous reports.

Dr. Susan Glade, a psychiatrist, has followed claimant since August 26, 1997 and she treats the depression with medication and sporadic counseling (exhibit 14f). The records show that claimant is prone to crying spells and bed rest, but she has reported that her medications are effective, i.e., the 8/06/01, 5/21/02, 10/22/02, 02/17/03 and 11/25/03 office notes and Dr. Glade has adjusted her medications in response to her complaints of reported adverse side effects.

On March 11, 2004 Dr. Glade completed a functional capacity assessment form furnished by claimant's attorney and opined that she had significant work-related mental limitations (exhibit 14f). However, I am not bound to accept even a treating psychiatrist's conclusion as to functional capacity or disability, particularly when the opinion is not supported by detailed, clinical diagnostic evidence. 20 CFR 404.1527 and SSRs 96-2p & 96-7p. This assessment was not prepared for legitimate medical

purposes of diagnosis or treatment and I find the proposed limitations are not supported by the psychiatrist's own records. Dr. Glade stated that claimant has had at least three episodes of decompensation or deterioration, but she did not list them and claimant has not required psychiatric in-patient care or frequent, intensive out-patient counseling. Dr. Glade stated that claimant cannot respond appropriately to supervision, co-workers and usual work situations, but there is no history of bizarre, aberrant, harmful or psychotic behaviors and claimant has admitted that she gets along with others.

Dr. Adatto occasionally addressed claimant's mental status and, on April 03, 2003, he noted that she reported normal activity and energy levels, with no change in appetite, and she was well-oriented (exhibit 2f). While, on May 29, 2003, Dr. Glade reported that the depression "at times impair[s] her concentration and memory," there is no indication of cognitive limitations in Dr. Glades' records or any other treating source. At the July 18, 2003 consultative psychiatric exam, claimant had normal thought content and processes, with no delusions or hallucinations, and she displayed an excellent memory and unimpaired concentration (exhibit 7f). Dr. Stewart also noted that she interpreted abstract proverbs and her general fund of knowledge was fair and commensurate with her education (claimant is a college graduate), thus showing that she is aware of current events and that her intellectual abilities have not declined.

\*       \*       \*       \*       \*       \*       \*

I have concluded that claimant retains the work-related mental abilities to perform, on a sustained basis (SSR 96-8p), these basic work activities: she must work with things more than people; she must have minimal contact with members of the general public; and she is limited to routine, repetitive, simple tasks. 20 CFR 404.1521(b).

(Tr. pp. 15-18)(emphasis added).

Contrary to plaintiff's present assertions, the ALJ did, in fact, weigh the opinions of Dr. Glade against the other credible medical evidence of record. After having done so, the ALJ simply decided not to give Dr. Glade's opinions controlling weight. That

was his prerogative as the ALJ has the sole responsibility for determining a claimant's disability status and is free to reject the opinion of <u>any</u> physician when the evidence supports a contrary conclusion. <u>Newton v. Apfel</u>, 209 F.3d 448, 455 (5th Cir. 2000)(quoting <u>Paul v. Shalala</u>, 29 F.3d 208, 211 (5th Cir. 1994), <u>overruled in part on other grounds by Sims v. Apfel</u>, 530 U.S. 103, 120 S.Ct. 2080 (2000)).  As respects the Psychiatric Evaluation Form in question, the opinions of Dr. Glade contained therein go to the ultimate issues reserved to the ALJ, namely, plaintiff's residual functional capacity and her disability status, 20 C.F.R. §§404.1527(e)(1), (f)(2), 404.1546, and the form is devoid of any acceptable, contemporaneously-recorded medical findings. <u>Newton</u>, 209 F.3d at 456; <u>Greenspan v. Shalala</u>, 38 F.3d 232, 237 (5th Cir. 1994), <u>cert. denied</u>, 514 U.S. 1120, 115 S.Ct. 1984 (1995); <u>Bradley v. Bowen</u>, 809 F.2d 1054, 1057 (5th Cir. 1987); <u>Scott v. Heckler</u>, 770 F.2d 482, 485 (5th Cir. 1985).  Moreover, as noted by the ALJ, certain of Dr. Glade's findings lack factual support or are contradicted by her own treatment records.  For example, Dr. Glade checked off a box on the form indicating that plaintiff had experienced three or more episodes of deterioration in a work-like setting due to her mental impairments but those episodes are not identified in either the form or the doctor's treatment notes.  The doctor also reported that she had treated plaintiff every one to two months between August 26, 1997 and March 11, 2004 but the records of Dr. Glade that were admitted in the administrative

proceedings below reflect that plaintiff generally averaged approximately four months between office visits.  On the other hand, insofar as plaintiff's treatment relationship with Dr. Glade began on August 26, 1997 but she was still able to work until June 15, 2001 despite her depression and anxiety, the ALJ properly found that those conditions were not preclusive of all work activities. Johnson, 864 F.2d at 347-48 (citing Fraga, 810 F.2d at 1306 n. 11). And the Court recalls that plaintiff testified to having stopped working in 2001 due to hand pain, not as a result of any mental impairment.

Dr. Glade indicated in the Psychiatric Evaluation Form that plaintiff had no impairments in the activities of daily living or in the ability to carry out simple job instructions.  The latter capability was credited by the ALJ as he incorporated it in his hypothetical questions to the VE.  Plaintiff's depression and anxiety have been managed with medication and periodic office visits but have not required intensive, frequent counseling sessions, in-patient treatment, or anti-psychotic drugs. Considering the evidence as a whole, the ALJ gave Dr. Glade's opinions the weight that they deserved and properly found that plaintiff was not disabled.

## RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this <u>13th</u> day of <u>September</u>, 2006.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

41